ORIGINAL
D+F
C|M

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

MAURICE BRUNET,

                    Plaintiff,

          -against-

UNITED STATES PROBATION
DEPARTMENT and JENNIFER A. PACE, U.S.
Probation Officer,

                    Defendants.
--------------------------------------------------------------x

**MEMORANDUM & ORDER**
No. CV-05-3042 (FB)(MDG)

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.

★  JUL 20 2006  ★

BROOKLYN OFFICE

*Appearances:*
*For the Plaintiff:*
KENECHUKWU CHUDI OKOLI, ESQ.
K.C. Okoli, Attorney at Law
330 Seventh Avenue, 15th Floor
New York, NY 10001

*For the Defendants:*
STEVEN MICHAEL WARSHAWSKY, ESQ.
United States Attorney's Office
147 Pierrepont Plaza
Brooklyn, NY 11201

**BLOCK, Senior District Judge:**

          For the reasons set forth in the Court's Memorandum and Order in *United States v. D'Agosta*, CR-03-541 (E.D.N.Y. Jan. 4, 2006), a copy of which is attached, the defendants' motion to dismiss is granted. Accordingly, plaintiff must comply with the Probation Office's directive to submit a DNA sample.

          **SO ORDERED.**

                                        FREDERIC BLOCK
                                        United States Senior District Judge

Dated:          Brooklyn, New York
                    July 19, 2006

1

FILED ORIGINAL
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.

☆ JAN 06 2006 ☆

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------x

UNITED STATES OF AMERICA,

    -against-

HUGH DOMINIC D'AGOSTA,

          Defendant.

----------------------------------------------------------x

**MEMORANDUM & ORDER**
No. CR-03-541 (FB)(RML)

*Appearances:*
*For the United States:*
ROSLYNN R. MAUSKOPF
United States Attorney
By:   MICHAEL A. ASARO, ESQ.
Assistant United States Attorney
Eastern District of New York
147 Pierrepont Street
Brooklyn, NY 11021

*For the Defendant:*
MILDRED M. WHALEN, ESQ.
Staff Attorney
Federal Defender Division
Eastern District of New York
16 Court Street
Brooklyn, NY 11241

**BLOCK, Senior District Judge:**

          Defendant Hugh D. D'Agosta ("D'Agosta") challenges the direction by the

United States Probation Office ("Probation Office") that he submit a blood sample that will

be transmitted to the Federal Bureau of Investigation ("FBI") for DNA identification as

violative of his Fourth Amendment rights.[1] As hereinafter explained, for the reasons set

forth in the Second Circuit's decision in *Nicholas v. Goord*, -- F.3d ---, 2005 WL 3150611, at

*3 (2d Cir. Nov. 28, 2005), and Judge Amon's decision in *Malvasi v. United States Dep't of

Probation*, CV-05-2828 (E.D.N.Y. Dec. 23, 2005), D'Agosta must comply with the directive.

---

    [1] The parties agreed that D'Agosta would not comply until the Court ruled on
the issue.

**I.**

D'Agosta is currently on supervised release following his conviction of one count of bank fraud in violation of 18 U.S.C. § 1344. Pursuant to 42 U.S.C. § 14135a(a)(2), the Probation Office is required "collect a DNA sample" from any individual "on probation, parole, or supervised release" who has been convicted of a "qualifying offense." Although at the time of D'Agosta's guilty plea, bank fraud under 18 U.S.C. § 1344 was not a qualifying offense, on October 30, 2004, Congress amended the definition of "qualifying offenses" to include "[a]ny felony." Justice For All Act of 2004 § 203(b), Pub. L. 108-405, 118 Stat. 2260 (codified at 42 U.S.C. § 14135a(d)(1)). Bank fraud is a felony.[2]

Under 42 U.S.C. § 14135a, following collection of the DNA sample, the Probation Office must transmit the sample to the FBI for DNA analysis and the results are then included in the Combined DNA Index System ("CODIS"), a nationwide database containing DNA evidence from federal, state and local sources. The sample and results may only be disclosed under certain limited circumstances outlined in 42 U.S.C. § 14132(b)(3);[3] if an individual knowingly discloses the sample or the results under any

---

[2] There can be no Ex Post Facto Clause violation. Even though an individual may subject to sanctions for refusing to provide a DNA sample, such a disciplinary measure does not constitute "punishment" within the meaning of the Ex Post Facto Clause. *See, e.g., Gilbert v. Peters*, 55 F.3d 237, 239 (7th Cir. 1995) ("Disciplinary measures imposed on inmates for failing to obey orders . . . do not violate the Ex Post Facto Clause."); *Jones v. Murray*, 962 F.2d 302, 310 (4th Cir. 1992).

[3] Disclosure is permitted only "(A) to criminal justice agencies for law enforcement identification purposes; (B) in judicial proceedings, if otherwise admissible pursuant to applicable statutes or rules; (C) for criminal defense purposes, to a defendant, who shall have access to samples and analyses performed in connection with

2

other circumstances, he or she is subject to criminal penalties. *See* 42 U.S.C. § 14135e(c). The statute also provides that an individual's DNA records will be expunged if the federal conviction is overturned. *See* 42 U.S.C. § 14132(d).

Under standard protocol for forensic DNA testing, the DNA information obtained is limited to simple identification information and does not reveal any physical or medical characteristics. *See* H.R. Rep. No. 106-900(I), at 27 ("[T]he genetic markers used for forensic DNA testing were purposely selected because they are not associated with any known physical or medical characteristics, providing further assurance against the use of convicted offender DNA profiles for purposes other than law enforcement identification. In common parlance, they show only the configuration of DNA at selected "junk sites" which do not control or influence the expression of any trait.").

## II.

### A. *Nicholas v. Goord*

*Nicholas* involved a New York state statute that, similar to the federal statute, provided for the collection and indexing of DNA from convicted felons.[4] The Second Circuit was called upon to determine whether the statute violated the Fourth Amendment. In so doing, it first concluded that the Supreme Court's special-needs test was the proper

---

the case in which such defendant is charged; or (D) if personally identifiable information is removed, for a population statistics database, for identification research and protocol development purposes, or for quality control purposes." 42 U.S.C. §§ 14132(b)(3), 14135e.

[4] Unlike the federal statute, the New York statute applied only to incarcerated individuals and, among them, only to those convicted of a subset of felonies.

test. *See Nicholas*, 2005 WL 3150611 at *11.

The Second Circuit held that the New York statute served a special need independent of ordinary evidence gathering associated with a criminal investigation because, notwithstanding that "the DNA samples may eventually help law enforcement identify the perpetrator of a crime, at the time of collection, the samples . . . provide no evidence in and of themselves of criminal wrongdoing, and are not sought for the investigation of a specific crime." *Id.* at *12 (citations and internal quotations omitted). In balancing the special need against the privacy intrusion, the Second Circuit commented that there was "little doubt that New York has a strong government interest in obtaining identifying information from convicted offenders and keeping a record of such information." *Id.* (citations omitted). In regard to the physical intrusion of a blood test, the circuit court stated that the intrusion was "far outweighed by the government's strong interest in obtaining from the plaintiffs the uniquely effective identifying information that DNA provides." *Id.* at *13. In regard to the analysis of the DNA information, it explained:

> Although DNA indexing has the potential to be broadly
> revealing, the New York statute as written does not provide
> for sensitive information to be analyzed or kept in its database.
> Rather it provides only for the analysis of identifying markers.
> The junk DNA that is extracted has, at present, no known
> function, except to accurately and uniquely establish identity.

*Id.*

**B. *Malvasi v. United States Dep't of Probation***

Judge Amon recently applied the teachings of *Nicholas* in analyzing whether

4

the federal DNA statute violated the Fourth Amendment in respect to plaintiffs who were, as D'Agosta, on supervised release, and correctly ruled that there was no violation. Judge Amon rejected plaintiffs' contention that *Nicholas* was not controlling because (1) it did not address the federal statute and (2) that plaintiffs' convictions were for non-violent offenses carrying a lower rate of recidivism.

As Judge Amon explained, like the New York statute, "the DNA samples are not obtained in the course of investigating any particular crime, and cannot by themselves reveal any criminal wrongdoing"; moreover, "the intrusion into plaintiffs' privacy permitted by the [federal DNA Act] is minimal." *Malvasi,* CV-05-2828 at 9, 11. In rejecting the recidivism argument, Judge Amon commented that although *Nicholas* "acknowledged that the government generally has an interest in reducing recidivism, the [circuit] court rested no part of its analysis on that interest." *Id.* at 13.

The Court adopts Judge Amon's comprehensive and well-reasoned opinion; accordingly, it rejects D'Agosta's refusal to comply with the Probation Office's directive.

5

## CONCLUSION

D'Agosta shall comply with any renewed direction by the Probation Office

to submit a DNA sample.

### SO ORDERED.

FREDERIC BLOCK
United States Senior District Judge

Dated:    Brooklyn, New York
          January 4, 2006

6

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

DENNIS MALVASI, and LORETTA MARRA,
                Plaintiffs,

      -against-

UNITED STATES DEPARTMENT OF
PROBATION, DEPARTMENT OF JUSTICE,
UNITED STATES ATTORNEY FOR THE
EASTERN DISTRICT OF NEW YORK,
THE FEDERAL BUREAU OF INVESTIGATION,
and UNITED STATES ATTORNEY GENERAL

                Defendants.
--------------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & DECISION**
05-CV-2828

AMON, United States District Judge.

       Plaintiffs Dennis Malvasi and Loretta Marra ask this Court to enjoin the U.S. Probation Office from collecting samples of their DNA and to issue a declaratory judgment that the DNA profiling statute, 42 U.S.C. 14135a, violates the Fourth Amendment of the United States Constitution (the "Fourth Amendment") and is unconstitutional on its face and as applied to them. In the alternative, they ask the Court to find that the Fourth Amendment prohibits the Government from preserving any DNA samples beyond the expiration of their terms of supervised release. Defendants move to dismiss Plaintiffs' complaint under Federal Rule of Civil Procedure 12(b)(6).

       After this Court heard arguments from the parties, a panel of the United States Court of Appeals for the Second Circuit resolved the issues presented by this case when it held in Nicholas v. Goord, No. 04-3887-pr, 2005 U.S. App. LEXIS 25607 (Nov. 28, 2005), that searches pursuant to New York's DNA statute, which is very similar to the federal Act, did not violate the Fourth Amendment. Both parties have filed supplemental papers with the

Court regarding the impact of <u>Nicholas v. Goord</u> on the issues presented in this case. Following <u>Nicholas,</u> and for the reasons stated below, the Court denies the relief plaintiffs seek and grants the defendants' motion to dismiss.

**I.    Background**

Plaintiffs in this case, Dennis Malvasi and Loretta Morra, pled guilty on April 15, 2003 to one count of conspiracy to harbor a fugitive in violation of 18 U.S.C. §§ 371 & 1071 for their roles in helping James Charles Kopp evade an intense international manhunt that sought him as a suspect in the 1998 murder of an abortion clinic doctor in Amherst, New York. (Plt. Mem. at 5 (June 13, 2005).) They were sentenced on August 21, 2003 to time served of 29 months of imprisonment and three years of supervised release. (<u>Id.</u>)  In November of 2004, a U.S. Probation Officer notified Plaintiffs that they would soon be required to provide blood samples for the purposes of DNA profiling pursuant to 42 U.S.C. § 14135a. (<u>Id.</u> at 1.)  Plaintiffs refused and on June 13, 2005 instituted this action.

**The DNA Act**

The DNA Analysis Backlog Elimination Act of 2000 ("the DNA Act" or "the Act"), Pub. L. No. 106-546, 117 Stat. 2726 (2000), 42 U.S.C. § 14135a, requires the collection of DNA samples from persons who are presently in custody, on release, parole or probation and who have been convicted of a "qualifying federal offense."[1]  The samples are to be provided to the FBI for analysis and inclusion in that agency's "Combined DNA Index System" ("CODIS") database, which also stores analyses of DNA samples recovered from crime

---

[1] The Act also allows, but does not require, the Director of the Bureau of Prisons or a probation officer to demand DNA samples from persons who are already profiled in the CODIS database or who have already given DNA samples pursuant to 10 U.S.C. § 1562, which requires collection of DNA samples from members of the armed services convicted of "qualifying military offenses."

2

scenes and from unidentified human remains, analyses of DNA samples voluntarily contributed by relatives of missing persons, and analyses collected pursuant to state or territorial DNA collection programs. 42 U.S.C. § 14135a(b); id. §§ 14132(a), (b). Failure to cooperate with the collection constitutes a class B misdemeanor. Id. § 14135a(a)(5).

At the time of Plaintiffs' guilty pleas, the list of "qualifying federal offenses" enumerated by the Act was limited to certain violent felonies and did not include conspiracy to harbor a fugitive. However, Congress through the PATRIOT Act in 2001 amended the list to include terrorism and other violent offenses, and then in 2004 again amended the list to include, *inter alia*, any felony and any attempt or conspiracy to commit a felony. See 42 U.S.C. § 14135a(d). The parties agree that the amended Act compels the collection of DNA from Plaintiffs.

The parties also agree that the primary purpose of the DNA Act is to aid law enforcement efforts to solve past and future crimes by allowing the comparison of the DNA of persons convicted of federal crimes with other DNA samples in the CODIS database. (See Def. Mem. 5; Plt. Mem. 18.) According to the Government, the information saved in CODIS is useful only for identification, and is not designed to convey "any other information about the person, such as physical or medical characteristics." (Def. Mem. 5.) Moreover, the DNA Act includes strict confidentiality rules and provides criminal penalties for improper disclosures of DNA samples or of the information contained in CODIS. 42 U.S.C. § 14135e.

## II.    Discussion

The parties agree that the collection of a DNA samples from either petitioner pursuant to the Act would constitute a search within the meaning of the Fourth Amendment. See Nicholas v. Goord, No. 04-3887-pr, 2005 U.S. App. LEXIS 25607, at *11–12 (Nov. 28, 2005)

(finding blood draw to be Fourth Amendment search); id. at *5 n.5 (stating that less invasive means of obtaining DNA samples could still constitute a search); cf. Schmerber v. California, 384 U.S. 757, 767 (U.S. 1966) (stating "it could not reasonably be argued" that a compulsory blood test was not a search subject to the Fourth Amendment). Therefore, the question before the Court is whether that search is an unreasonable search prohibited by the Fourth Amendment.

The Fourth Amendment generally prohibits unreasonable searches and seizures. U.S. Const. amend. IV. Most searches are reasonable only when performed pursuant to a warrant issued upon a showing of probable cause. Nat'l Treasury Employees Union v. Von Raab, 489 U.S. 656, 665 (1989). However, the Supreme Court has held that "neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance." Id. In particular, a search performed without a warrant and not supported by probable cause may nevertheless be reasonable within the meaning of the Fourth Amendment when it serves "special needs, beyond the normal need for law enforcement," which make the warrant and probable-cause requirements impracticable. New Jersey v. T.L.O., 469 U.S. 325, 351 (1985) (Blackmun, J. concurring).

In New Jersey v. T.L.O., a New Jersey public school principal who suspected 14 year old student "T.L.O." of smoking in a school restroom contrary to school rules searched T.L.O.'s purse, discovered evidence suggesting that she had been selling marijuana to other students, and turned that evidence over to the police. T.L.O., 469 U.S. at 328. When the state brought delinquency charges against T.L.O. in the county Juvenile and Domestic Relations Court, T.L.O. asserted that the principal's search of her purse violated the Fourth Amendment. T.L.O., 469 U.S. at 328–29.

4

The majority in T.L.O. characterized its Fourth Amendment inquiry as balancing "the schoolchild's legitimate expectations of privacy [against] the school's equally legitimate need to maintain an environment in which learning can take place." Id. at 340. The Court then found that the school setting permitted warrantless searches by public officials because requiring a warrant before every search "would unduly interfere with the maintenance of the swift and informal disciplinary procedures needed in the schools." Id. Similarly, school officials need not establish probable cause that a crime has been committed before searching a student, because probable cause "is not an irreducible requirement of a valid search." Id. "Rather, the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search." Id. at 341. Balancing the governmental and private interests at stake, the Court concluded that the search of T.L.O.'s purse was reasonable. Id. at 343.

Justice Blackmun concurred with the majority's conclusion, but wrote separately to argue that the majority had omitted "a crucial step in its analysis." Id. at 350. According to Justice Blackmun, the Supreme Court had previously applied such a balancing test only in cases presenting "a special law enforcement need for greater flexibility." Id. (quoting Florida v. Royer, 460 U.S. 491, 514 (1983) (Blackmun, J., dissenting)). In Blackmun's view, the drafters of the Fourth Amendment had already balanced the interests at issue in most searches and concluded that such searches could be reasonable only when performed pursuant a warrant supported by probable cause. Id. Thus, "[o]nly in those exceptional circumstances in which special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable, is a court entitled to substitute its balancing of interests for that of the Framers." Id.

The Court adopted Blackmun's "special needs" terminology in <u>O'Connor v. Ortega</u>, 480 U.S. 709, 720 (1987) (plurality opinion), and <u>Griffin v. Wisconsin</u>, 483 U.S. 868, 873 (1987). In <u>Griffin,</u> the Court addressed a warrantless search of a probationer's home conducted by probation officers at the behest of local police who suspected the probationer of possessing a weapon but who lacked the probable cause necessary to obtain a warrant. 483 U.S. at 871. The regulations governing supervised release in Wisconsin permitted any probation officer to search a probationer's home without a warrant as long as the officer's supervisor approved and the officer had "reasonable grounds" to believe the presence of contraband. <u>Id.</u> at 870–71. The search produced a handgun and led to a felony charge of possession of a handgun by a convicted felon. The probationer sought to suppress the evidence of the handgun as the product of an unreasonable search in violation of the Fourth Amendment. <u>Id.</u> at 872. The Supreme Court held that the search was reasonable after finding that "[a] State's operation of a probation system, like its operation of a school, government office or prison, or its supervision of a regulated industry, likewise presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements." <u>Id.</u> at 873–74. Citing research which suggested that close supervision could reduce recidivism, the Court concluded that supervision of probationers was a special need permitting a greater infringement on the privacy of probationers than would be permissible if applied to the public at large. <u>Id.</u> at 875. The Court further found that requiring a warrant would impracticably interfere with the probation system by reducing the deterrent effect of "possibly expeditious" searches. <u>Id.</u> at 876.

Following <u>Griffin,</u> the Supreme Court applied the special needs analysis to hold unconstitutional a variety of blanket searches that were conducted primarily for ordinary law

enforcement purposes. See, e.g., Ferguson v. City of Charleston, 532 U.S. 67 (2001) (finding no special need in hospital program of surreptitious drug testing of pregnant women where results used for law enforcement purposes); City of Indianapolis v. Edmond, 531 U.S. 32 (2000) (finding no special need for vehicle checkpoints aimed at interdicting illegal drugs); Chandler v. Miller, 520 U.S. 305 (1997) (finding unreasonable testing of candidates for designated state offices). In other cases, where the Court perceived a special need for the search beyond the ordinary needs of law enforcement, the Court found no Fourth Amendment violation. See, e.g., Vernonia School Dist. 47J v. Acton, 515 U.S. 646 (1995) (allowing testing of high school students participating in interscholastic sports); Nat'l Treasury Employees Union v. Von Raab, 489 U.S. 656 (1989) (allowing testing of United States Customs Service employees seeking promotion to certain sensitive positions); Skinner v. Railway Labor Executives' Assn., 489 U.S. 602 (1989) (allowing drug and alcohol testing of railway employees after accidents).

The Second Circuit has twice applied the special needs analysis to state DNA statutes, and in each case upheld the collection of DNA. In Roe v. Marcotte, the Circuit held that Connecticut's DNA statute, which required the collection of DNA samples from convicted and incarcerated sex offenders, served the special needs of reducing recidivism and facilitating the prosecution of sex offenders, against whom DNA evidence was particularly useful. 193 F.3d 72, 75 (2d Cir. 1999). More recently, in Nicholas v. Goord, the Circuit upheld the constitutionality of searches pursuant to the 1999 version of New York's DNA statute, which required the collection of DNA samples from certain categories of convicted felons. Nicholas v. Goord, No. 04-3887-pr, 2005 U.S. App. LEXIS 25607 (Nov. 28, 2005). The court in Nicholas found that although the New York statute primarily served law

7

enforcement needs, these needs were not the ordinary needs of law enforcement because the DNA samples "provide no evidence in and of themselves of criminal wrongdoing and are not sought for the investigation of a specific crime." Nicholas, 2005 U.S. App. LEXIS 25607, at *47 (quotation marks omitted). In both cases, once the courts identified special needs served by the statutes, they upheld the searches as reasonable in light of the compelling governmental interests at stake and the petitioners' diminished expectations of privacy. Roe, 193 F.3d at 79–80; Nicholas, 2005 U.S. App. LEXIS 25607, at *47–56.

In this Court's view, the decision of the Second Circuit in Nicholas v. Goord is dispositive of the issues presented in this case.[2] In particular, it rejects plaintiffs' contention that the special need served by the Act must be wholly unrelated to the needs of law enforcement. A search for law enforcement purposes is acceptable so long as those purposes are not the ordinary needs of law enforcement. Nicholas, 2005 U.S. App. LEXIS 25607 at *46–47. In Nicholas, the court held that the law enforcement purpose served by searches under New York's DNA statute was not an ordinary need of law enforcement because the searches were not conducted to investigate any specific crime and did not seek information that could in and of itself reveal any wrongdoing. Id.; see also Green v. Berge, 354 F.3d 675, 678 (7th Cir. 2004) (finding state's testing of inmates' DNA reasonable under special needs analysis, even though for law enforcement goal, because not undertaken "for the investigation of a specific crime." (quoting Shelton v. Gudmanson, 934 F. Supp. 1048 (W.D. Wis. 1996))).

---

[2] The plaintiffs attempt to minimize the impact of Nicholas on this Court's determination by asserting that there was no majority opinion "as to the rationale grounding the finding" in that case. (Plt. Ltr. at 4, Dec. 5, 2005.) As the government points out, this is inaccurate. Although each of the three judges wrote separately, and emphasized differing reasoning in each of the three opinions, the decision clearly states that "Judges Leval and Lynch join the opinion" authored by Chief Judge Walker. Nicholas, 2005 U.S. App. LEXIS 25607 at *2.

The same is true of searches pursuant to the DNA Act: the DNA samples are not obtained in the course of investigating any particular crime, and cannot by themselves reveal any criminal wrongdoing. In essence, all that is obtained under such searches is identifying information that may aid future investigations. See Miller v. United States Parole Comm'n, 259 F.Supp. 2d 1166 (D. Kan. 2003) (finding identification to be special need justifying DNA Act searches); cf. Kincade II, 379 F.3d at 837 (noting that DNA Act searches serve to identify offenders).

Having found that the searches at issue serve a special need other than the ordinary needs of law enforcement, the Court must weight the individual's privacy interest against the governmental interests in order to determine whether the search was reasonable within the meaning of the Fourth Amendment. See Nicholas, 2005 U.S. App. LEXIS 25607 at *47–48.

The governmental interest in searches pursuant to the DNA Act is strong. Maintaining a comprehensive database of information that accurately identifies convicted felons allows the government to improve the accuracy and efficiency of future investigations. See Nicholas, 2005 U.S. App. LEXIS 25607 at *48 (finding strong state interest in New York DNA searches); Roe, 193 F.3d at 79 (finding strong state interest in investigating sex crimes and in deterring recidivism); Sczubelek, 402 F.3d at 185 (emphasizing state interest in accurate criminal prosecutions); Kincade II, 379 F.3d at 838-39 (finding strong state interest in investigating crimes by probationers and deterring recidivism).

This interest must be balanced against the intrusions the searches make on plaintiffs' reasonable expectations of privacy, which, as with all probationers and persons on supervised release, are significantly diminished. Knights, 534 U.S. at 119; Griffin, 483 U.S. at 874. The court in Nicholas held that such intrusions are twofold: first, there is a physical intrusion to

9

extract the DNA sample; second, there is the potential privacy intrusion occasioned by the analysis of that sample and maintenance of the results in the DNA database. <u>Nicholas</u>, 2005 U.S. App. LEXIS 25607 at *49. The Supreme Court has held that the physical "intrusion occasioned by a blood test is not significant" for Fourth Amendment purposes, since it represents little more than a pinprick. <u>Skinner</u>, 489 U.S. at 625. The Second Circuit in <u>Nicholas</u> arrived at the same conclusion in the context of acquisition of DNA samples, especially in light of the plaintiff prisoner's reduced expectation of bodily privacy. <u>Nicholas</u>, 2005 U.S. App. LEXIS 25607 at *49. Similarly, the physical intrusion upon plaintiffs in this case is not constitutionally significant, and is outweighed by the governmental interests at stake.

The intrusion into plaintiffs' privacy occasioned by the analysis of the DNA sample and maintenance of the analytic results in the CODIS database is also minimal. Although analysis of DNA samples could in theory reveal a range of information about the individuals from which the samples were taken, such analysis is not permitted under the DNA Act. The Act defines "DNA analysis" as "analysis of the deoxyribonucleic acid (DNA) identification information in a bodily sample," 42 U.S.C. § 14135a(c)(2), and permits only the results of such analyses to be stored in the CODIS database, <u>see id.</u> at § 14132(b) (providing CODIS shall include only certain "information on DNA identification records and DNA analyses"); <u>id.</u> at § 14135a(b) (providing that results of DNA analyses will be included in CODIS). The analyses stored in CODIS may only be provided to law enforcement agencies "for identification purposes," or used in judicial proceedings, or for criminal defense purposes.[3]

---

[3] If personally identifying information is removed, other uses are permissible. <u>See</u> 42 U.S.C. 14135a(b)(3)(D) (allowing use of anonymous samples for "a population statistics database, for identification research and protocol development purposes, or for quality control purposes").

Unauthorized use or disclosure of DNA analysis data from the CODIS database may be

penalized by a fine of up to $250,000 or imprisonment up to one year, per incident. Id. at §

14135e(c). The Act also provides that the DNA records relating to a particular individual

must be expunged from CODIS if that individual's conviction is overturned. Id. at §

14132(d). Moreover, there has been no allegation in this case that the government has in fact

used any DNA samples for any unauthorized or nefarious purpose, nor any allegation that the

government intends to use the samples it collects from the plaintiffs for such purposes; the

plaintiffs have merely speculated that such future misuse is within the realm of possibility. In

Nicholas, the Second Circuit analogized the intrusion presented by the state's DNA program

to the intrusion presented by the maintenance of fingerprint records, and held that the

additional intrusion presented by the analysis of DNA samples was minimal. Nicholas, 2005

U.S. App. LEXIS 25607, at *54. The Court finds no basis to distinguish the federal DNA Act

in this respect, and concludes that the intrusion into plaintiffs' privacy permitted by the Act is

minimal.

     The plaintiffs argue that the federal DNA Act at issue here may be distinguished from

the New York statute at issue in Nicholas because it allows DNA samples to be taken from all

convicted felons, whereas the New York statute limits such searches to persons convicted of

certain offenses which plaintiffs characterize as "violent." All but two of the plaintiffs in

Nicholas had been convicted of some homicide offense, Nicholas v. Goord, 2003 U.S. Dist.

LEXIS 1621, at *5 (S.D.N.Y. Feb. 6, 2003), whereas the plaintiffs here are currently serving

terms of supervised release for nonviolent offenses. The plaintiffs contend that dicta in Roe

regarding an assertedly low rate of recidivism among felons convicted of nonviolent offenses

should lead this Court to conclude that the DNA Act is unconstitutional as applied to the

11

plaintiffs in this case, who were convicted of nonviolent offenses. As an initial matter, the

Court notes that the New York statute addressed in <u>Nicholas</u> covered some offenses which

could hardly be characterized as violent, such as identity theft and criminal possession of a

controlled substance. <u>See</u> N.Y. Exec. Law § 995. In addition, the Court finds that even if it

accepts these two contentions—that the New York statute only encompasses violent offenses

and that nonviolent offenders recidivate less frequently than persons convicted of violent

offenses—the reasoning applied in <u>Nicholas</u> nevertheless compels this Court to hold that the

searches of plaintiffs are reasonable within the meaning of the Fourth Amendment.

The court in <u>Roe</u> found that the reduction of recidivism among sex offenders was one

of two special needs served by the Connecticut DNA statute. <u>Roe</u>, 193 F.3d at 79, 82 (2d Cir.

1999). A showing that this purpose had little relevance to a particular plaintiff therefore could

conceivably have affected the threshold determination of whether or not a search of that

plaintiff would serve a special need other than the ordinary needs of law enforcement. In the

more recent <u>Nicholas</u> decision, however, the court explicitly rejected the reduction of

recidivism as a special need justifying the search. Rather, it found that the New York DNA

statute served the single special need of accurately identifying felons to aid in future

prosecutions or investigations. <u>Nicholas</u>, 2005 U.S. App. LEXIS 25607 at * 43–44. This

Court similarly finds that the special need served by the DNA Act is the creation and

maintenance of a database allowing the accurate identification of felons and not the reduction

of recidivism. That need applies equally to violent and nonviolent offenders.

The Court may nevertheless consider the reduction of recidivism, if any, as being

among the governmental interests to be balanced against the intrusion into the individual's

privacy in the second step of the special needs analysis. Although the <u>Nicholas</u> court

12

acknowledged that the government generally has an interest in reducing recidivism, the court

rested no part of its analysis on that interest and does not appear to have weighed it

significantly, if at all, when balancing the interests implicated by the New York statute.

Similarly, this Court finds that even if searches pursuant to the DNA Act have no deterrent

effect, such searches remain reasonable.  The government interest in accurately identifying

felons is strong.  The plaintiffs' reasonable expectations of privacy are weak, because they are

currently subject to a program of supervised release, cf. Knights, 534 U.S. at 119 (stating

probationers have reduced privacy expectations); Griffin, 483 U.S. at 874 (same), and

because they have been repeatedly photographed and fingerprinted as a result of their

convictions, cf. Nicholas, 2005 U.S. App. LEXIS 25607, at *54 (finding incarcerated

prisoners had minimal privacy expectations in their identities because they had been

repeatedly photographed and fingerprinted).  As the court in Nicholas concluded, "plaintiffs'

status as convicted felons renders minimal the degree to which the [DNA] statute intrudes on

their privacy." Id.  Thus, even if the plaintiffs here could establish that they present no great

risk of recidivism, their reduced privacy expectations and the government's high interest in

accurately identifying them would render searches of them pursuant to the DNA Act

reasonable.

For the foregoing reasons, the Court concludes that, like the New York statute at issue

in Nicholas, the federal DNA Act does not violate the Fourth Amendment to the United States

Constitution because it serves a special need other than the ordinary needs of law

enforcement, is supported by strong governmental interests, and presents only minor

intrusions into plaintiffs' reduced expectations of privacy.

13

The Court likewise declines to find that the continued maintenance of DNA analysis information in the CODIS database after the plaintiffs' terms of supervised release expire would be unconstitutional. First, the Second Circuit explicitly considered such arguments in Nicholas and concluded that the potentially indefinite retention of DNA analysis information did not render the New York scheme unconstitutional. Nicholas, 2005 U.S. App. LEXIS 25607, at *51–54. Moreover, the only relevant factor that would change upon the expiration of the plaintiffs' terms of supervised release is that they would have a marginally higher expectation of privacy insofar as they would no longer be subject to certain release conditions, such as those allowing unannounced visits and 'plain-sight' searches by probation officers. Plaintiffs would continue to have reduced privacy expectations in their identities insofar as their photographs and fingerprints would remain on file with the government, and the intrusion into their privacy would therefore remain acceptably low. Id. at *55 n.32.

## III.    Conclusion

For the reasons stated above, the Court finds that the collection of plaintiffs' DNA for inclusion in the CODIS database, as required by the DNA Act, is not an unreasonable search prohibited by the Fourth Amendment. Accordingly, the Court grants the Defendants' motion to dismiss Plaintiffs' complaint under Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief may be granted.

SO ORDERED.

CAROL BAGLEY AMON
United States District Judge

Dated: Brooklyn, New York
December 23, 2005

14